UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

SHIRLEY VANHOOZER,
Plaintiff,
v.
MICHAEL J. ASTRUE, Commissioner of the Social Security Administration,
Defendant.

CASE NO. 1:07-cv-01622-DFH-TAB

ENTRY ON JUDICIAL REVIEW

Plaintiff Shirley Vanhoozer seeks judicial review of a decision by the Commissioner of the Social Security Administration denying his application for disability insurance benefits. After a hearing, an Administrative Law Judge (ALJ) determined on behalf of the Commissioner that Mr. Vanhoozer's vision impairment limited his employment options but was not severe enough to render Mr. Vanhoozer disabled during his eligibility period. On judicial review, Mr. Vanhoozer argues that the ALJ made several reversible errors. As explained below, the court affirms the ALJ's decision. It is supported by substantial evidence, and the court finds no reversible error.

*Background*

Mr. Vanhoozer was born in 1952 and performed a variety of unskilled jobs until 1997. Since 1997, he has attempted to work but has not held employment

for more than five months in total. Records indicate that he completed the ninth or tenth grade.

In December 1985, Mr. Vanhoozer's eyes were burned by a caustic chemical. On December 11, 1997, Dr. Francis Price performed a corneal transplant on Mr. Vanhoozer's right eye to treat a corneal ulcer and scarring. R. 124. Dr. Price indicated that Mr. Vanhoozer's condition was worsening prior to the transplant. R. 131. After the surgery, Mr. Vanhoozer's condition initially improved.

On April 19, 2004, Mr. Vanhoozer completed a disability report listing his conditions and symptoms. R. 232-41. He reported blindness in his right eye, a painful left eye that "waters constantly," and a back ailment. R. 233. He reported that these injuries limited his ability to work because he cannot see and has to strain his left eye "to see at all." *Id*. Mr. Vanhoozer also stated that he became unable to work in 1986 and that he last worked in 1999 but could not continue to work because of his vision limitations. *Id.*

On July 13, 2004, Mr. Vanhoozer completed a disability report listing additional complaints since his April report. He complained that he is often light headed and dizzy and that sunlight and heat bother him. R. 248. He also reported heart pain but said he could not afford to treat the problem. R. 253. On

August 11, 2004, he said that because of his eye, his chest pains, and his back pains, he "can't do much of anything." R. 266.

At the request of the Indiana Disability Determination Bureau, Dr. Earl Braunlin performed an ophthalmology consultative examination and a visual fields test of Mr. Vanhoozer on May 25, 2004. R. 284. He found that Mr. Vanhoozer's uncorrected visual acuity was hand motion in his right eye and 20/60 in his left eye. *Id.* He found that Mr. Vanhoozer's best corrected visual acuity was hand motion in his right eye and 20/30 in his left eye. R. 285.

The Disability Determination Bureau requested that Dr. L. Bastnagel complete a report based on the consultative examination. R. 288. On June 24, 2004, Dr. Bastnagel concluded that Mr. Vanhoozer had an unsuccessful right eye corneal transplant and that his left eye had corneal cloudiness with "normal acuity" and "good field." *Id.*

Mr. Vanhoozer visited Dr. Gerald Warrener on July 19, 2004, complaining of chest pains. R. 290. He also reported chronic lower back pain. *Id.* Dr. Warrener said that Mr. Vanhoozer told him he "hasn't doctored in many years." *Id.* He diagnosed Mr. Vanhoozer with "[a]typical chest pain." *Id.* An EKG yielded normal results, and Dr. Warrener found no irregularities with Mr. Vanhoozer's

heart and recommended Protonix and a heating pad. *Id.*[1] Mr. Vanhoozer visited Dr. Warrener again on August 27, 2004 because of continued chest pain. R. 300. Dr. Warrener performed a chest exam that was normal, but he wrote that Mr. Vanhoozer "really needs a chest x-ray and probably an upper GI or endoscopy if his discomfort continues." *Id.* Mr. Vanhoozer told Dr. Warrener that he was reluctant to do testing because of the cost. *Id.* Dr. Warrener diagnosed Mr. Vanhoozer with "Chest pain, either muscular skeletal or reflux in nature," "Degenerative arthritis of the spine," and "Blindness, right eye." *Id.* He gave Mr. Vanhoozer samples of Protonix. *Id.*

On April 19, 2005, Dr. Robert Rea, an ophthalmologist, completed a residual functional capacity questionnaire at Mr. Vanhoozer's request. R. 293. Dr. Rea said that he had seen Mr. Vanhoozer intermittently since 1985, and he diagnosed Mr. Vanhoozer with "chemical kercto conjunctivitis with scarring." R. 295. He found that Mr. Vanhoozer's best corrected visual acuity was hand motion in his right eye and 20/30 in his left eye. *Id.* Dr. Rea also found that Mr. Vanhoozer had severely limited peripheral vision in his right eye and nearly normal peripheral vision in his left eye. *Id.* Dr. Rea reported that Mr. Vanhoozer could never perform activities involving depth perception and "accommodation" in a competitive work situation, and he reported that Mr. Vanhoozer could occasionally perform activities involving near acuity, far acuity, and color vision. R. 296. He said that Mr. Vanhoozer could frequently perform activities requiring

---

[1] Protonix is a medication commonly used to treat acid reflux and heartburn.

field of vision. *Id.* He said that Mr. Vanhoozer could work with small and large objects, but he said these actions would be limited by eye pain, which he described as "interfer[ing] with all activity." *Id.* Furthermore, he said Mr. Vanhoozer could avoid hazards in the workplace. *Id.* Dr. Rea wrote that Mr. Vanhoozer's symptoms would constantly interfere with his ability to pay attention and concentrate during the work day. R. 297. Dr. Rea concluded: "Currently Mr. VanHoozer has too much pain to work." *Id.* In a subsequent letter to Mr. Vahoozer's attorney, Dr. Rea confirmed that he did not see Mr. Vanhoozer from November 4, 1997 to March 21, 2005. R. 311. Dr. Rea also recommended a disability onset date of April 2000. *Id.*

On January 17, 2007, Dr. Warrener completed a state Medicaid form and indicated that he had treated Mr. Vanhoozer for "10+ years." R. 312. He indicated that Mr. Vanhoozer's chest was normal and that he suffered from complete blindness in this right eye, partial blindness in his left eye, Social Anxiety Disorder, gastroesophageal reflux, and chronic back pain. R. 313, 315. He identified 1998 as the beginning date for the blindness. R. 315. He reported that Mr. Vanhoozer had moderate limitations in the following areas: standing, walking, pushing/pulling, squatting, crawling, climbing, repetitive leg movements, and normal housework, and significant limitations in the following areas: lifting, bending, being around machinery, and driving. R. 317. He said that Mr. Vanhoozer's impairments would permanently affect his ability to work. R. 316.

Mr. Vanhoozer's attorney reported to the ALJ that Mr. Vanhoozer worked as a scrap metal bundler for Gulf Stream Coach, Inc., from October 2004 to February 2005, but that he was "unable to carry through with the employment" and was dismissed because the company deemed him "high risk." R. 306. The attorney argued that the employment did not constitute "substantial gainful activity." *Id*. He also requested that Mr. Vanhoozer be found disabled as of April 2000. R. 307.

This case is Mr. Vanhoozer's second application for disability benefits; in 1998, he made his first application for benefits, claiming blindness in his right eye and extreme photosensitivity. R. 95. The Commissioner denied his first claim on December 1, 1998 and upon reconsideration on March 1, 1999. R. 51, 57. ALJ Ann Grover denied Mr. Vanhoozer's appeal on March 30, 2000. R. 40-47. Mr. Vanhoozer did not appeal ALJ Grover's decision. R. 21.

Mr. Vanhoozer applied for disability insurance benefits again on April 22, 2004. R. 219-21. That application gave rise to this case. The Social Security Administration denied Mr. Vanhoozer's claim initially and upon reconsideration. R. 197, 203. At Mr. Vanhoozer's request, an ALJ held a hearing on May 25, 2006, and the ALJ denied his claim on May 1, 2007. R. 21-30. On November 13, 2007, the Appeals Council denied Mr. Vanhoozer's request for review. R. 8.

Mr. Vanhoozer submitted several documents to the Appeals Council after the ALJ's denial on May 1, 2007. Among these late submissions, on April 20, 2005, Dr. Price wrote that Mr. Vanhoozer likely had suffered a loss of depth perception. R. 354. On June 20, 2007, Dr. Allison Good, an optometrist, examined Mr. Vanhoozer and found that he had a best corrected left eye visual acuity of 20/200. R. 359. She concluded that Mr. Vanhoozer was "unable to work or drive" and that "per section 2.02 of Social Security's listing of impairments Shirley meets the eligibility requirements for disability." *Id.*

Mr. Vanhoozer also submitted additional documentation about his visits to Dr. Warrener. The documentation seems to indicate that he visited Dr. Warrener's office multiple times between 1991 and 2007, including a visit in both 2002 and 2003. R. 361-77. Mr. Vanhoozer complained of back pain at the 2002 and 2003 visits. R. 373.

*Testimony at the Hearing*

On May 25, 2006, Mr. Vanhoozer testified about the pain in his eyes. He testified that the pain was like a "toothache" and that light hurt his right eye. R. 407-08. He said that when he was active, the pain produced headaches that "[f]eel like my head wants to split wide open." R. 415. He also said that he was sensitive to light, dust, fumes, and heat. *Id.* He testified that he slept or listened to the radio in the dark most of the day. R. 417-18. He explained that his left eye

felt like it had "a layer of skin over it . . . like it's itching." R. 421. He continued: "I rub so hard it's red . . . like one minute you see, the next minute you don't." *Id*. Mr. Vanhoozer testified that his eye condition was progressively worsening and that it was worse at the time of testimony than it had been in 2003. R. 423.[2] Mr. Vanhoozer also testified that his eye problems hurt him emotionally: "It hurts me because I can't get out and do things with my family or grandkids." R. 412. He also said: "I feel like giving up, why am I still living . . . ." R. 422. He did not testify about back or chest problems.

Mr. Vanhoozer reported the eye medication that he was taking at the time. R. 409. He testified that he took an eye drop every two hours in his left eye. R. 410, 419. He also said that he applied an ointment to his eyes every night. R. 419. Mr. Vanhoozer explained that his uncle applied his eye drops for him because it was difficult for him to apply the drops without wasting them. *Id*. He testified that the doctor gave him samples of the eye drops because he could not afford to buy them. R. 410.

Mr. Vanhoozer testified that he worked for Gulf Stream Coach in 2003 collecting scrap metal. R. 407. Mr. Vanhoozer did not notify the company of his eye ailment when he applied for his job. He said, "I [lied] on my application

---

[2]The ALJ asked Mr. Vanhoozer's attorney if he would be "more comfortable if I have Dr. Rea give us a supplemental opinion relating back to the last insured date . . . ." R. 423. The transcript's account of the response is unclear. Attorney: "Well, that's the problem you have with the –." ALJ: "Right." Attorney: "– the DIV or DIV." *Id*.

because I needed a job." R. 420. When he worked at Gulf Stream he had to have co-workers apply the eye drops. R. 419. He testified that he stopped working at Gulf Stream Coach because the company felt he was a safety risk and because it put pressure on his right eye to work. R. 407. His boss discovered his eye ailment by coming up on his "blind side" and seeing Mr. Vanhoozer's watery eye. R. 420. Mr. Vanhoozer also suggested that the boss discovered his ailment when the boss saw co-workers putting drops in his eyes. R. 420. Mr. Vanhoozer testified that he quit the job after the confrontation. R. 421.

The ALJ sought to determine whether an individual with symptoms similar to Mr. Vanhoozer's symptoms could work. He asked vocational expert Dr. Joseph Havranek:

> I'd like you to consider some one who remains capable of performing activities that do not require binocular vision, binocular vision, that does not require vision for small details and which would include fine work and, and observing letters and doing close reading for prolonged periods. This person cannot work in atmospheric concentrations of dust, smoke and chemical fumes or temperature and humidity extremes that wouldn't be as comfortable as ordinary retail, commercial environments. It would have to be work that would accommodate his need for wearing protective eyewear. This individual could not work in direct sunlight, would be able to lift and carry as much as 50 pounds occasionally and 20 pounds frequently. With these limitations would there be any of the claimant's past work that I read to you that would accommodate?

R. 424. Dr. Havranek responded that such an individual could work as an industrial cleaner. *Id.* He also testified that work in the "medium, light, [and] sedentary levels" would be consistent with the hypothetical individual's

limitations. R. 425. Dr. Havranek testified that, in the Fort Wayne area, there were approximately 500 to 750 jobs available as a hand packager, 150 to 250 jobs available as a floor waxer, 200 to 250 jobs available as a laundry folder, and 100 to 150 jobs available as a collator operator. *Id*. Dr. Havranek said that most of these jobs did not require exposure to chemicals and that a maximum of half of the industrial cleaner jobs would be eliminated if the worker could have "absolutely [ ] no concentration exposure at all." R. 426-27. Dr. Havranek also testified that most jobs at the sedentary level are not available to someone with the visual impairment provided in the ALJ's hypothetical question. R. 425-26. Dr. Havranek testified that the jobs he listed could be performed if the employee had to take a ten minute break every two hours to apply eye drops, but that the jobs might not be available if the employee needed co-workers' assistance to apply the drops. R. 428.

*Disability Standards and Judicial Review*

To be eligible for disability insurance benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of no less than twelve months. 42 U.S.C. § 423(d). If a claimant's impairment is listed in Part 404, Appendix 1, Subpart P of the implementing regulations, and if the duration requirement is met, then disability is presumed. 20 C.F.R.

§ 404.1520(d). Otherwise, a claimant can establish disability only if his impairments are of such severity that he is unable to perform both work that he has previously performed and all other substantial work available in the national economy. 20 C.F.R. § 404.1520(f), (g).

This is a rigorous standard. A claimant is not necessarily entitled to benefits even if he has substantial impairments. The Act does not contemplate degrees of disability or allow for an award based on partial disability. *Stephens v. Heckler*, 766 F.2d 284, 285 (7th Cir. 1985). Benefits are paid for with tax dollars, including taxes paid by people for whom working is quite painful and difficult. Under the statutory standard, these benefits are available only as a matter of nearly last resort.

The implementing regulations for the Act provide the familiar five-step process to evaluate a disability claim. See 20 C.F.R. § 404.1520(a)(4). The steps are:

(1) Is the claimant currently employed? If so, he is not disabled.

(2) If not, does the claimant have a severe impairment or combination of impairments? If not, he is not disabled.

(3) If so, does the impairment meet or equal an impairment listed in the regulations? If so, he is disabled.

(4) If not, does the claimant retain the residual functional capacity to do his past relevant work? If so, he is not disabled.

(5) If not, does the claimant retain the residual functional capacity to perform other work in the national economy? If so, he is not disabled. If not, he is disabled.

When applying this test, the burden of proof rests on the claimant for the first four steps and on the Commissioner for the fifth step. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

*The ALJ's Disability Determination*

The ALJ employed the five-step process to evaluate Mr. Vanhoozer's disability claim. At step one, the ALJ determined that Mr. Vanhoozer had engaged in substantial gainful activity between what the ALJ deemed his alleged onset date, June 1, 1985, and his date last insured, September 30, 2003. R. 24. The ALJ also found that there was no evidence that Mr. Vanhoozer had substantial gainful activity during the period between his first disability denial, March 30, 2000, and his date last insured, September 30, 2003. *Id.* At step two, the ALJ found that Mr. Vanhoozer had a severe vision impairment that limited his ability to perform work that required binocular vision and perception of fine details, as well as work that exposed him to pollutants. R. 25. At step three, the ALJ found that Mr. Vanhoozer did not have an impairment or combination of impairments that met or equaled a listed impairment. *Id.* Before proceeding to step four, the ALJ wrote that Mr. Vanhoozer was not reliable as a witness. R. 25-26 At step four, the ALJ determined that Mr. Vanhoozer had the residual functional capacity to perform a restricted range of medium work, including past work as an

industrial cleaner. R. 26-28. The ALJ also addressed step five, and he found that Mr. Vanhoozer could make an adjustment to other work. R. 28-29.

*Standard of Review*

If the Commissioner's decision is supported by substantial evidence, it must be upheld by a reviewing court. 42 U.S.C. § 405(g); *Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*, quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971). To determine whether substantial evidence exists, the court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's judgment by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses. *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits," the court must defer to the Commissioner's resolution of that factual conflict. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

A reversal and remand may be required, however, if the ALJ committed an error of law, *Binion*, 108 F.3d at 782, or if the ALJ based the decision on serious factual mistakes or omissions. *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996). The ALJ has a basic obligation to develop a full and fair record, *Nelson v. Apfel*, 131 F.3d 1228, 1235 (7th Cir. 1997), and must build an accurate and

logical bridge between the evidence and the result to permit meaningful judicial review of the administrative findings. *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003); *Sarchet*, 78 F.3d at 307. If the evidence on which the ALJ relied does not support the conclusion, the decision cannot be upheld. *Blakes*, 331 F.3d at 569.

*Discussion*

I. *The ALJ's Failure to Order Additional Testing for Mr. Vanhoozer*

Mr. Vanhoozer argues first that the ALJ should have ordered further testing to determine the severity of his back problems, chest pain, and light-headedness because he could not afford to test or treat these problems adequately. During the administrative proceedings, Mr. Vanhoozer's attorney twice requested additional examinations for his back and chest problems. The ALJ did not commit reversible error by failing to order additional testing because Mr. Vanhoozer has not shown how the testing would change the determination that he was not disabled as of September 30, 2003.

An ALJ has a duty "to develop a full and fair record" in a Social Security hearing. *Nelson*, 131 F.3d at 1235. The Seventh Circuit has commented more than once "on the difficulty of having a 'complete' record as 'one may always obtain another medical examination, seek the views of one more consultant, wait six months to see whether the claimant's condition changes, and so on.'" *E.g.*,

*Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir. 1994), quoting *Kendrick v. Shalala*, 998 F.2d 455, 456-57 (7th Cir. 1993). Courts should therefore respect an ALJ's "reasoned judgment" regarding how much evidence to gather in a particular case. *Luna*, 22 F.3d at 692. The primary responsibility for producing medical evidence demonstrating the severity of impairments remains with the claimant. 20 C.F.R. § 404.1512(c); *Luna*, 22 F.3d at 693.

The ALJ did not explain his rationale for not ordering more testing. However, the ALJ was presented with an unusual situation: Mr. Vanhoozer's date last insured was September 30, 2003, and another ALJ had found that Mr. Vanhoozer was not disabled in 2000. The ALJ in this case had no information concerning the period from 2000 to 2003. To win disability insurance benefits, Mr. Vanhoozer had to establish that he was disabled by September 30, 2003. *Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997). Based on the lack of information for these dates, the ALJ discounted much of the information that Mr. Vanhoozer presented, which came from either before or after the relevant period. The ALJ considered evidence of Mr. Vanhoozer's then-current condition in 2006, but did not find that it suggested disability during the relevant period. Mr. Vanhoozer has not shown how examinations ordered in 2006 would have offered any valuable new information to the ALJ about his condition from 2000 to 2003. See *Meredith v. Bowen*, 833 F.2d 650, 655 (7th Cir. 1987) (diagnosis in 1984 not relevant for claimant whose insured status expired in 1973); 20 C.F.R. § 404.1519b(c) (consultative examination will not be ordered when, in disability

insurance claim, "insured status expired in the past and there is no possibility of establishing an onset date prior to the date [claimant's] insured status expired"). The ALJ did not commit reversible error by failing to order more testing.[3]

II. *The Function-by-Function Analysis*

Before expressing a claimant's residual functional capacity in terms of exertional categories like "sedentary," "light," "medium," "heavy," or "very heavy," the ALJ must first make a more detailed function-by-function assessment of a claimant's current physical and mental abilities. SSR 96-8p, printed in 61 Fed. Reg. 34474, 34476 (July 2, 1996). These functions include the claimant's ability to sit, stand, walk, lift, carry, push, pull, and see.

The ALJ may not select and discuss only the evidence that favors his ultimate conclusion. The ALJ must minimally articulate reasons for rejecting or accepting specific evidence of disability so that a reviewing court can trace the path of the ALJ's reasoning. *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004). The ALJ may not ignore an entire line of evidence that is contrary to the ruling.

---

[3]Mr. Vanhoozer cites *Brennan-Kenyon v. Barnhart*, 252 F. Supp. 2d 681 (N.D. Ill. 2003), for the proposition that the ALJ should have ordered additional testing for him because of his limited means. *Brennan-Kenyon* does not stand for this proposition. The claimant in that case did not seek medical treatment or obtain medication for her impairments, and the ALJ questioned the claimant's credibility based on this lack of treatment and medication. *Id.* at 696-97. The court merely said that the ALJ should seek out more information before questioning a claimant's credibility on this basis, and the court noted that the claimant likely did not seek treatment because she could not afford it. *Id.* at 697; accord, *Caviness v. Apfel*, 4 F. Supp. 2d 813, 820-21 (S.D. Ind. 1998) (same).

See *Golembiewski v. Barnhart*, 322 F.3d 912, 917-18 (7th Cir. 2003) (remanding because ALJ improperly ignored three lines of evidence). The ALJ is not required, however, to provide an in-depth analysis of every piece of evidence the claimant provides. *Rice*, 384 F.3d at 371.

The ALJ drew the following conclusions about Mr. Vanhoozer's remaining physical abilities:

> The claimant could lift and carry 50 pounds occasionally and 20 pounds frequently. The claimant could not have worked in jobs that required binocular vision due to blindness in his right eye, nor could he have performed work which would have demanded fine work. The claimant could not have performed work which required perception for fine details, that required reading of small letters or other reading for prolonged periods, or that required close work with small objects. The claimant would have been required to wear protective eyewear, and he could not have worked in atmospheric concentrations of dust, smoke, and chemical fumes, or temperature and humidity extremes that would not have been as comfortable as ordinary retail, commercial environments. The claimant could not have tolerated work in direct sunlight.

R. 26. Mr. Vanhoozer argues that the function-by-function assessment does not consider all of his impairments.

A. *Sufficiency of the Function-by-Function Assessment*

The residual functional capacity analysis was based on a proper function-by-function assessment. The ALJ discussed all of Mr. Vanhoozer's alleged impairments. The ALJ first explained accurately that the record contained a dearth of information establishing that any of Mr. Vanhoozer's conditions had

worsened between his last denial in 2000 and the date last insured in 2003. The ALJ stated that the problem with much of Mr. Vanhoozer's evidence was that it did not address his ailments during the relevant time period.

The ALJ discussed Mr. Vanhoozer's blindness, limited left eye vision, back ailments, chest ailments, and social anxiety disorder. The ALJ factored in several visual limitations, including right eye blindness. He also included a limitation on perception of fine details and close work with small objects. He included a requirement that Mr. Vanhoozer either wear protective eyewear or not be near dust, smoke, fumes, or temperature and humidity extremes. Finally, he limited Mr. Vanhoozer from working in direct sunlight.

The ALJ explained why he did not factor in Mr. Vanhoozer's claims of back pain in making the residual functional capacity. First, the ALJ found Mr. Vanhoozer's statements to medical care providers to be not credible. Mr. Vanhoozer offered no evidence of back problems that developed before the date last insured. The ALJ found that Dr. Warrener's diagnosis of arthritis in the spine was "not substantiated" during the relevant period. The ALJ noted that the record established only two visits to Dr. Warrener, that there was no objective evidence to support Dr. Warrener's arthritis diagnosis, and that even if the diagnosis were valid, there was no evidence to support a severe back impairment during the relevant period. R. 26-27. While the ALJ ordinarily gives substantial weight to a

treating physician's opinion, the ALJ can discount the opinion for good reasons. See *Schmidt v. Astrue*, 496 F.3d 833, 842-43 (7th Cir. 2007).

The ALJ properly articulated his reasons for discounting Mr. Vanhoozer's claims of chest pain during the relevant period. Like the back pain, the ALJ explained that there was no evidence of chest pains before the date last insured in 2003. The credibility finding also supports the ALJ's decision because much of the evidence suggesting a chest problem was based only on Mr. Vanhoozer's subjective reports of pain. The ALJ also noted that the July 2004 EKG was "completely normal."

The function-by-function assessment did not fail to consider Mr. Vanhoozer's combined impairments. The ALJ considered only Mr. Vanhoozer's visual impairments because he properly discounted the other alleged impairments. Mr. Vanhoozer is correct that an ALJ cannot ignore an impairment merely because it is "not severe," but the ALJ does not have to give weight to impairments that have not been substantiated when the ALJ explains why these impairments have not been included.

B. *Lack of Depth Perception and Visual Acuity*

The ALJ did not address claims of Mr. Vanhoozer's lack of depth perception and visual field, but these omissions were not reversible error. The ALJ noted Mr.

Vanhoozer's reduced visual acuity in his left eye and the blindness in his right eye. While the ALJ did not specifically address the potential loss of depth perception or visual field, this oversight does not rise to the level of "ignor[ing] an entire line of evidence that is contrary to the ruling." *Golembiewski*, 322 F.3d at 917. Specific references in the record to a loss of depth perception are limited. Dr. Robert Rea checked a box indicating that Mr. Vanhoozer could never perform work requiring depth perception. R. 296. The only other reference to a lack of depth perception was in a letter from Dr. Rea submitted to the Appeals Council. R. 354.[4] Dr. Bastnagel's consultative examination report described Mr. Vanhoozer as having "good field." R. 288. Dr. Rea indicated that Mr. Vanhoozer could frequently perform activities requiring field of vision. R. 296. Considering the ALJ's discussion of Mr. Vanhoozer's limited vision and the limited evidence offered to support claims of reduced depth perception and visual field, the ALJ did not commit reversible error by not specifically mentioning these limitations.

C. *Need for Assistance in Applying Eye Drops While Working*

---

[4]This court's role in reviewing denials of applications for Social Security benefits is to evaluate the merits of the ALJ's decision based on the evidence before the ALJ, not evidence later submitted to the Appeals Council. See *Eads v. Secretary of Dept. of Health & Human Services*, 983 F.2d 815, 818 (7th Cir. 1993). A reviewing court may order the Commissioner to look at additional evidence only if the claimant can show that "there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g) (sentence six). Mr. Vanhoozer has not made such a showing.

The ALJ did not commit reversible error in his discussion of Mr. Vanhoozer's need for assistance in applying eye drops.[5] The vocational expert testified that Mr. Vanhoozer may be disqualified from many jobs if he needs such assistance. However, the evidence supporting Mr. Vanhoozer's need for assistance comes from his testimony, which the ALJ determined to be not credible. See R. 25-26. An ALJ's credibility determination is entitled to considerable deference. *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). In his credibility analysis, the ALJ discussed Mr. Vanhoozer's need to apply eye drops and explained that he needed eye drops less frequently in 2006 than he did in his 2000 denial. Mr. Vanhoozer has not identified a need to apply eye drops during his eligibility period.

D. *Obesity*

The ALJ erred by failing to consider Mr. Vanhoozer's obesity. The ALJ must consider obesity as an impairment. *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). Multiple references to Mr. Vanhoozer's weight in the record should have put the ALJ on notice that he is overweight. See *id*. However, it was harmless error not to consider obesity when Mr. Vanhoozer has not explained how his obesity affected his ability to work. See *id*. While there is no evidence that the ALJ adopted any limitations proposed by doctors who were aware of Mr.

---

[5]The ALJ also did not commit reversible error by failing to discuss Mr. Vanhoozer's alleged need to take medication during the day. Mr. Vanhoozer has not explained how this need would render him disabled. The vocational expert testified that the hypothetical individual could work notwithstanding a need to take medication every two hours.

Vanhoozer's obesity, as in *Skarbek*, the ALJ did consider the opinions of many doctors, and these doctors did not raise obesity as a major concern.

E. *Visual Acuity*

Finally, Mr. Vanhoozer suggests that the ALJ should have determined his left eye best corrected acuity to be 20/200. The ALJ determined Mr. Vanhoozer's left eye best corrected acuity to be 20/30, and this was not error. The ALJ based the 20/30 acuity on Dr. Braunlin's consultative examination report. Dr. Rea also noted a left eye best corrected acuity of 20/30 in 2005. In a 2007 document submitted to the Appeals Council after the ALJ's decision, Dr. Allison Good reported Mr. Vanhoozer's left eye best corrected acuity to be 20/200. The court will not overturn the ALJ's findings based on evidence submitted only to the Appeals Council unless Mr. Vanhoozer shows cause, which he has not done. See 42 U.S.C. § 405(g). If his condition continued to deteriorate, and if he qualifies otherwise, a later application for supplemental security income might be in order.

III. *Consideration of the Full Record*

Mr. Vanhoozer's third argument is that the ALJ ignored critical evidence and made erroneous conclusions by misconstruing other evidence. Specifically, he argues that the ALJ failed to consider Dr. Robert Rea's April 2005 residual functional capacity questionnaire, that the ALJ's conclusion that his best corrected acuity in his left eye was 20/30 was "problematic," and that the ALJ incorrectly determined his onset date and the date last insured. None of these alleged errors rise to the level of reversible error.

The ALJ's failure to discuss Dr. Rea's April 19, 2005 residual functional capacity questionnaire was not reversible error. Dr. Rea filled out the questionnaire form at Mr. Vanhoozer's request. The questionnaire discussed Mr. Vanhoozer's limited vision and reported eye pain that precluded him from working. R. 295-97. The ALJ did not discuss the residual functional capacity, but he refused to give weight to Dr. Rea's opinion on another matter (the onset date) because of Dr. Rea's lack of contact with Mr. Vanhoozer after 1997. Mr. Vanhoozer has not shown how Dr. Rea's 2005 questionnaire could affect the ALJ's determination of whether he was disabled on the date last insured, September 30, 2003. The ALJ noted that Dr. Rea had no contact with Mr. Vanhoozer from 1997 to 2006.[6] Additionally, the residual functional capacity questionnaire's main contribution to the record is its claim that Mr. Vanhoozer's eye pain severely limited his ability to work, and the ALJ explained why Mr. Vanhoozer's statements about his condition were not credible. R. 25-26.

The ALJ's determination that Mr. Vanhoozer's best corrected acuity was 20/30 in his left eye was supported by the record. Mr. Vanhoozer criticizes the ALJ for disputing that his uncorrected left eye acuity was 20/60. The ALJ neither agreed nor disagreed with a 20/60 uncorrected acuity. The record contains substantial evidence to support the conclusion that Mr. Vanhoozer's best

---

[6]The ALJ's dates appear to be slightly incorrect. The records suggest that Mr. Vanhoozer did not see Dr. Rea from November 4, 1997 through March 21, 2005. R. 311. Dr. Rea completed the residual functional capacity questionnaire on April 19, 2005. R. 297.

corrected acuity in his left eye was 20/30. The ALJ used the 20/30 and 20/60 numbers, which were from a May 25, 2004 questionnaire, to establish that Mr. Vanhoozer's acuity had not significantly decreased as of that date. Because the ALJ did not dispute that Mr. Vanhoozer's left eye acuity was 20/60 and evidence supports the conclusion that his left eye best corrected acuity was 20/30, the ALJ did not err.

The ALJ correctly determined the date last insured to be September 30, 2003. On June 16, 2004, an official in the Disability Field Office reported a date last insured of September 30, 2018. R. 243. An Administration document dated June 22, 2004, states that the same official suggested a "DISCO" computer report to determine the proper date last insured, but the document also states a date last insured of December 31, 2010. R. 246. On February 24, 2006, the DISCO computer report determined that Mr. Vanhoozer's date last insured was September 30, 2003. R. 213. The ALJ adopted this date in his opinion. R. 21. Mr. Vanhoozer's attorney in the initial application process also indicated a date last insured of September 30, 2003. R. 301. Mr. Vanhoozer has provided no evidence to dispute that the ALJ properly determined his date last insured.

Finally, the ALJ did not commit reversible error in his characterization of Mr. Vanhoozer's alleged onset date. The ALJ asserted that Mr. Vanhoozer's alleged onset date was June 1, 1985, but that he was only determining whether Mr. Vanhoozer was disabled between March 30, 2000 and September 30, 2003.

The first ALJ had determined that Mr. Vanhoozer was not disabled as of March 30, 2000, and that decision was final through that date. R. 21. In his letter to the ALJ, Mr. Vanhoozer's attorney claimed an onset date of April 2000. R. 301. Other parts of the record contain contradictory information about when Mr. Vanhoozer first became unable to work. Compare R. 223 (suggesting 1997), with R. 233 (suggesting 1986). Even if the ALJ incorrectly characterized Mr. Vanhoozer's alleged onset date, this did not affect his determination. The ALJ attempted to determine whether Mr. Vanhoozer's condition had worsened after March 30, 2000 and before September 30, 2003. Because of the March 2000 denial, it does not matter whether Mr. Vanhoozer's "alleged" onset date was 1985 or 2000. Mr. Vanhoozer's attorneys have acknowledged that the April 2000 date was based on the March 2000 denial.[7] The ALJ determined that Mr. Vanhoozer was not disabled between March 30, 2000 and September 30, 2003. This is the same as setting an onset date of April 2000.

IV. *The Need for a Medical Expert at the Hearing*

---

[7]Mr. Vanhoozer points out that the ALJ, in making a credibility determination, characterized him as alleging that he was disabled in 1985. The ALJ then suggested that Mr. Vanhoozer was not credible because he worked from 1985 to 1997. Mr. Vanhoozer suggests that the ALJ's incorrect characterization of the onset date means that the ALJ's credibility determination is flawed. This is not correct. One record indicates that Mr. Vanhoozer may have claimed he was unable to work as far back as 1986, R. 233, and the ALJ's credibility determination was based on many considerations independent of the 1985 onset date. R. 25-26.

Mr. Vanhoozer's final argument is that the ALJ erred in not having a medical expert at the hearing to interpret technical information in the record. He argues that the ALJ should have consulted a medical expert to interpret visual field tests and to determine whether his vision restrictions met a listing.

The ALJ did not err when he failed to consult a medical expert to interpret visual field tests. Mr. Vanhoozer cites SSR 07-01p, which explains how to read visual field tests. 72 Fed. Reg. 41796 (July 31, 2007). As the Commissioner points out, this ruling was not issued until after the ALJ's May 1, 2007 opinion. However, even if this ruling had been in effect, it would not dictate a remand. Mr. Vanhoozer does not explain how SSR 07-01p would require the use of a medical expert. The two visual field tests that Mr. Vanhoozer points to as unexplained are also unavailing. The first set of tests was submitted to the ALJ in Mr. Vanhoozer's first case in March 2000. The tests are dated January 26, 2000, which is before the relevant period. The second test was performed on May 24, 2004, and attached to Dr. Braunlin's consultative examination report. R. 287. Neither Dr. Braunlin's report nor Dr. Bastnagel's report (based on Dr. Braunlin's examination) identified a significant visual field restriction. Additionally, on June 28, 2004, Dr. Bastnagel signed a "Disability Determination and Transmittal" form certifying that Mr. Vanhoozer was not disabled through September 30, 2003. R. 195. Dr. Bastnagel also noted a finding of "good field." R. 288. The ALJ did not ignore any evidence, and Mr. Vanhoozer has not shown that referring to an additional medical expert would have led the ALJ to a different conclusion.

Finally, while it is generally true that an ALJ must consult a medical expert to determine whether an impairment meets a listing, Mr. Vanhoozer has not shown that the ALJ's failure to consult a medical expert was reversible error in this case. During the administrative hearings, Mr. Vanhoozer did not claim that his impairment met a listing. Mr. Vanhoozer does not explain now how the ALJ's consulting a medical expert could possibly result in a different outcome. The only evidence offered by the plaintiff suggesting that a listing was met is Dr. Good's June 20, 2007 letter stating that Mr. Vanhoozer's left eye best corrected acuity was 20/200, which meets Listing 2.02. R. 359. Dr. Good is correct that a best corrected acuity of 20/200 met Listing 2.02, but that was in 2007, not in 2003. This evidence, which was submitted only to the Appeals Council, cannot be considered in this judicial review. Substantial evidence supports the ALJ's determination that Mr. Vanhoozer's left eye best corrected acuity was 20/30 at the relevant time.

*Conclusion*

The decision of the ALJ is affirmed. Final judgment will be entered consistent with this entry.

So ordered.

Date: November 26, 2008

DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Charles Hankey
charleshankey@hankeylawoffice.com

Thomas Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov